**2026 WI 24**

# Supreme Court of Wisconsin



WAUKESHA COUNTY,
*Petitioner-Respondent,*

*v.*

R.D.T.,
*Respondent-Appellant-Petitioner.*

No. 2024AP1390
Decided June 30, 2026

REVIEW of a decision of the Court of Appeals
Waukesha County Circuit Court (Cody J. Horlacher, J.) No.
2023ME178

REBECCA FRANK DALLET, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and BRIAN K. HAGEDORN, JANET C. PROTASIEWICZ, and SUSAN M. CRAWFORD, JJ., joined. REBECCA FRANK DALLET, J., filed a concurring opinion, in which JILL J. KAROFSKY, C.J., and JANET C. PROTASIEWICZ, J., joined. ANNETTE KINGSLAND ZIEGLER, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined.

¶1 REBECCA FRANK DALLET, J. Ryden[1] argues that a now-expired order extending his involuntary commitment under WIS. STAT.

---

[1] A pseudonym.

§ 51.20 (2021–22)[2] should be vacated because the circuit court relied on inadmissible hearsay when it concluded that he was dangerous to himself or others. This case presents two questions: (1) whether Ryden's appeal of the challenged order is moot; and (2) if not, whether an error by the circuit court requires us to vacate that order. We hold that Ryden's appeal is not moot. We further conclude that the order should not be vacated because, even if the circuit court erred, that error did not affect Ryden's substantial rights. *See* § 51.20(10)(c).

I

¶2      Under WIS. STAT. § 51.20(1)(a), individuals may be involuntarily committed if they are (1) mentally ill, drug dependent, or developmentally disabled; (2) proper subjects for treatment; and (3) dangerous. A circuit court in Jefferson County made those findings in October 2021, and committed Ryden for a period not to exceed six months. Ryden was subsequently recommitted[3] for one year in April 2022 and again for six months in April 2023. *See* § 51.20(13)(g)2r.–3. (permitting recommitment if a circuit court again finds that the elements in § 51.20(1)(a) are met). Shortly after the April 2023 recommitment, Ryden moved to Waukesha County for work, and his commitment was transferred there. As the end of that recommitment period approached, Waukesha County petitioned to recommit Ryden for another year.

¶3      At the recommitment hearing, the County presented testimony from Danielle Weber, a licensed clinical social worker for Waukesha County. Weber testified about the factual circumstances that led to Ryden's initial commitment in Jefferson County, and his history of hospitalizations there. She described how, after Ryden discontinued prescribed psychotropic medication, he displayed paranoid and delusional beliefs, and became threatening and aggressive towards his parents. Weber also testified that Ryden denied having a mental illness

---

[2] All subsequent references to the Wisconsin Statutes are to the 2021–22 version unless otherwise indicated.

[3] The relevant statutes use both "recommitment," *see* WIS. STAT. § 51.20(13)(g)2r., and "extension of a commitment," *see* § 51.20(13)(g)3., to refer to continuing a commitment after the initial commitment period. For consistency, we will refer to this process as "recommitment."

and needing medication, and that he has a history of stopping his medication. Weber said she was concerned that, if he was not recommitted, Ryden would stop his medications entirely and his symptoms would worsen. Ryden, through his counsel, did not object to any of Weber's testimony. On cross-examination, Weber agreed that the information she testified to regarding events that occurred in Jefferson County came from either Ryden's treatment records or conversations with his previous treatment providers, and that she did not "see or hear or participate in anything that happened in Jefferson County."

¶4 Weber authored a report summarizing Ryden's diagnoses, medications, and treatment history, and recommending that Ryden be recommitted. The report included descriptions of events that occurred in Jefferson County prior to Weber's personal involvement with Ryden's commitment and treatment. It also described several statements made by Ryden's parents about the circumstances leading to Ryden's initial commitment and subsequent hospitalizations, and statements made by a third person about Ryden's behavior. At the end of Weber's direct testimony, the County moved this report into evidence. Ryden's attorney objected to the admission of the report "[o]nly to reliance on hearsay for the truth of the matter asserted." The circuit court replied, "Noted. It will be received."

¶5 The County additionally called Dr. Charles Rainey, a forensic psychiatrist and one of Ryden's court-appointed examiners. Dr. Rainey testified that he was not able to schedule an in-person interview before he was required to submit his report to the court. His report and opinions, therefore, were based on a review of Weber's report, conversations with Weber, and an email he received from Weber about Ryden's progress and status.

¶6 In his testimony, Dr. Rainey opined to a reasonable degree of medical certainty that Ryden suffers from a treatable mental illness that affects his thoughts, mood, and perceptions. He agreed that Ryden's mental illness "grossly impair[s] . . . his judgment, behavior, [and] capacity to recognize reality," and described the symptoms of Ryden's mental illness as including grandiose and delusional beliefs and paranoia. Dr. Rainey further opined that Ryden would experience decreased mood stability, increased manic and grandiose beliefs, and would become physically aggressive toward others if he stopped taking his prescribed medications. Ryden, through his counsel, did not object to any of Dr. Rainey's testimony.

¶7 Like Weber, Dr. Rainey authored a report detailing his opinions and the information on which those opinions were based, including a one-paragraph summary of Ryden's mental health history and engagement with treatment. This summary was based on information provided by Weber and included statements attributed to Ryden and one of Ryden's treatment providers. At the close of Dr. Rainey's direct testimony, the County moved his report into evidence. Ryden's attorney again objected to the admission of the report "only to receipt of hearsay and other inadmissible evidence for truth of the matter asserted." The circuit court stated that "[t]he report will be admitted into evidence" "[s]ubject to the objection."

¶8 Neither party called additional witnesses or moved additional items into evidence. After argument from both parties, the court granted the recommitment petition. Relevant to this case, the circuit court determined that Ryden was dangerous under the standards in § 51.20(1)(a)2.c. and (1)(am). Referencing the language of those statutes, the circuit court concluded that there was "a substantial probability of physical impairment or injury to [Ryden] . . . due to impaired judgment" and that there was "a substantial likelihood based on [Ryden's] treatment record that [he] would be a proper subject for commitment if treatment were withdrawn." The circuit court subsequently entered an order recommitting Ryden for one year ("the September 2023 recommitment order").

¶9 Ryden appealed, arguing that the circuit court relied on inadmissible hearsay when concluding that he was dangerous and that the non-hearsay evidence was insufficient to support that conclusion. While the appeal was pending, Ryden was recommitted for a fourth time in September 2024. Because Ryden was no longer subject to the September 2023 recommitment order, and vacating that order "[would] not have any practical effect," the court of appeals held that Ryden's appeal was moot. *Waukesha County v. R.D.T.*, No. 2024AP1390, unpublished slip op., ¶¶8, 11 (Wis. Ct. App. Feb. 12, 2025). While the court of appeals stated that it "therefore [would] not address the merits" of Ryden's appeal, it nonetheless opined that "any alleged errors that occurred during [Ryden's] September 2023 hearing are harmless." *Id.*, ¶¶14–15. Before this court, Ryden argues that his appeal is not moot and renews his arguments on the merits.

II

¶10    Whether Ryden's appeal is moot is a question of law, which we review de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶16, 390 Wis. 2d 50, 937 N.W.2d 901. We review a circuit court decision admitting or excluding evidence for an erroneous exercise of discretion. *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. Even if hearsay evidence was erroneously admitted at Ryden's recommitment hearing, however, WIS. STAT. § 51.20(10)(c) directs that we must "disregard any error or defect in the . . . proceedings that does not affect the substantial rights of either party."

III

¶11    We begin with the question of whether Ryden's appeal is moot. "Appellate courts generally decline to reach moot issues, and if all issues on appeal are moot, the appeal should be dismissed."[4] *Portage County v. J.W.K.*, 2019 WI 54, ¶12, 386 Wis. 2d 672, 927 N.W.2d 509. "An issue is moot when its resolution will have no practical effect on the underlying controversy." *PRN Assocs. LLC v. DOA*, 2009 WI 53, ¶25, 317 Wis. 2d 656, 766 N.W.2d 559.

¶12    This court has previously addressed the mootness of an appeal challenging the validity of an expired recommitment order under WIS. STAT. § 51.20. In *Sauk County v. S.A.M.*, we held that "an appeal of an expired recommitment order is not moot because vacating the order would still have practical effects on two of the order's collateral consequences." 2022 WI 46, ¶27, 402 Wis. 2d 379, 975 N.W.2d 162. Those consequences are "the liability for the cost of care received while subject to the recommitment order," and "the ability to restore [the] constitutional right" to possess a firearm. *Id*.

¶13    The County argues that Ryden's appeal from the September 2023 recommitment order is moot notwithstanding *S.A.M.* because there is no evidence that vacating that order would have a practical effect on

---

[4] Even when an issue is moot, we may still choose to address it if one of several established exceptions applies. *See Portage County v. J.W.K.*, 2019 WI 54, ¶12, 386 Wis. 2d 672, 927 N.W.2d 509.

Ryden's liability for the cost of his care or the restoration of his firearm rights. We disagree and reaffirm our holding in *S.A.M.*

A

¶14    We first address the practical effect of vacating the September 2023 recommitment order on Ryden's liability for the cost of his care. WISCONSIN STAT. § 46.10(2) imposes mandatory liability on individuals committed under § 51.20 "for the cost of the care, maintenance, services and supplies" received from state institutions or county departments as part of their commitment. In *S.A.M.*, we concluded that "a direct causal relationship exists between vacating an expired recommitment order and removing the liability it creates" for the cost of care. 402 Wis. 2d 379, ¶24; *see also Jankowski v. Milwaukee County*, 104 Wis. 2d 431, 436–41, 312 N.W.2d 45 (1981) (concluding that individuals are not liable under § 46.10 for the cost of care received pursuant to an invalid commitment). We therefore held that the liability imposed by § 46.10(2) "is a collateral consequence that renders recommitment appeals not moot." *S.A.M.*, 402 Wis. 2d 379, ¶24. We made clear that "it is irrelevant whether collection efforts have begun because, regardless, [the subject individual] remains liable solely by virtue of § 46.10(2)'s mandatory language ('shall be liable')." *Id.*, ¶25. "The threat of potential collection actions," therefore, "may follow [the individual] unless and until [the] recommitment order is vacated or the liability is satisfied."[5] *Id.*

¶15    The County argues that *S.A.M.* is distinguishable because Ryden has not met his burden of showing that he is currently liable to Waukesha County for a debt. The County acknowledges that the liability imposed by § 46.10(2) is automatic, but notes that it may be fully satisfied by the time of appeal if the committed individual or a third party has paid

---

[5] The court of appeals nevertheless held that Ryden's appeal was moot because "there is no indication that the County is seeking . . . reimbursement" for the cost of his care during the September 2023 recommitment. *Waukesha County v. R.D.T.*, No. 2024AP1390, unpublished slip op., ¶13 (Wis. Ct. App. Feb. 12, 2025). "[W]ithout some likelihood of that occurring," the court of appeals reasoned, the effect of vacating the September 2023 order on Ryden's liability for the cost of that care "is an illusory consequence." *Id.* This reasoning is directly contrary to our holding in *Sauk County v. S.A.M.*, and we therefore reject it. *See* 2022 WI 46, ¶25, 402 Wis. 2d 379, 975 N.W.2d 162.

for the care. Thus, without a showing by Ryden that the liability remains unsatisfied, the County claims that his appeal is moot because he has not established a "threat of potential collection actions" that vacating the September 2023 recommitment order would remove. *S.A.M.*, 402 Wis. 2d 379, ¶25.

¶16   There are two problems with the County's argument. First, it is the County's burden to establish that the appeal is moot. *See Wis. Mfrs. & Com., Inc. v. DNR*, 2024 WI App 18, ¶44, 411 Wis. 2d 462, 5 N.W.3d 903, *rev'd on other grounds*, 2025 WI 26, 416 Wis. 2d 561, 21 N.W.3d 718. Ryden therefore has no obligation to demonstrate that the liability for the cost of his care during the September 2023 recommitment remains unsatisfied. Second, there is nothing in the record demonstrating that the liability has been fully satisfied.[6] *See State ex rel. Wolf v. Town of Lisbon*, 75 Wis. 2d 152, 155, 248 N.W.2d 450 (1977) (explaining that our review is limited to facts in the record). Without any such evidence, this case is in the same posture as *S.A.M.*: Ryden is subject to automatic statutory liability for the cost of his care, and is thus threatened by potential collection actions. *See* § 46.10(8)(a), (c) (permitting the Department of Health Services to continually probe Ryden's financial condition to evaluate his ability to pay and to bring suit against him to recover payment); *S.A.M.*, 402 Wis. 2d 379, ¶¶24–25. Because vacating the September 2023 recommitment order would have the practical effect of removing that threat, we hold that Ryden's appeal is not moot.

B

¶17   We next consider the practical effect that vacating the September 2023 recommitment order would have on Ryden's ability to restore his right to possess firearms. Ryden has been prohibited from possessing firearms under § 51.20(13)(cv)1. since his initial commitment.[7]

---

[6] We acknowledge that the County moved to supplement the record with evidence not presented below purportedly showing that the cost of Ryden's care during the relevant recommitment period was paid by a third party. That motion was denied.

[7] Section 51.20(13)(cv)1. provides that when committing an individual under § 51.20, "the court shall order the individual not to possess a firearm . . . if the court determines that the individual is prohibited, under 18 U.S.C. § 922(g)(4), from possessing a firearm." Under 18 U.S.C. § 922(g)(4), it is unlawful

An individual subject to such a prohibition, however, may petition a court to restore their firearm-possession rights. § 51.20(13)(cv)1m.a. When determining whether to grant such a petition, the court considers whether "the circumstances regarding [the individual's commitment] and the individual's record and reputation indicate that the individual is not likely to act in a manner dangerous to public safety" and whether granting the petition would be contrary to the public interest. § 51.20(13)(cv)1m.b.

¶18    In *S.A.M.*, we held that the appeal of an expired recommitment order is not moot because vacating that order could have a practical effect on these factors.[8] 402 Wis. 2d 379, ¶23. "[T]he fact that the recommitment order no longer exists," we said, would "practically alter a committed person's 'record and reputation' for dangerousness" and "might influence the reviewing court's weighing of whether restoring gun rights would be consistent with the 'public interest.'" *Id*. (quoting § 51.20(13)(cv)1m.b.).

¶19    The County argues that *S.A.M.* is distinguishable because *S.A.M.* involved only a single recommitment while Ryden has been recommitted multiple times. According to the County, vacating Ryden's recommitment order would have no practical effect on his ability to

---

for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to "possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

[8] The court of appeals also held that Ryden's appeal was moot because vacating the September 2023 recommitment order would have no practical effect on Ryden's firearm rights. *R.D.T.*, No. 2024AP1390, at ¶13. The court of appeals reasoned that because Ryden's subsequent recommitment in September 2024 also included a firearms prohibition, Ryden would remain prohibited from possessing firearms even if the September 2023 recommitment order was vacated. *Id*. In *S.A.M.*, however, we held that the appeal of an expired recommitment order was not moot even though vacating that order would not immediately terminate a prohibition on possessing firearms stemming from a separate, unchallenged commitment order. *See* 402 Wis. 2d 379, ¶¶22–23. That Ryden remains subject to a firearms prohibition even if the September 2023 recommitment order is vacated is therefore insufficient to render his appeal moot.

restore his firearm-possession rights since a court's assessment of his record and reputation for dangerousness and the public interest would still include multiple recommitments. In *S.A.M.*, however, we made clear that the effect of vacating a recommitment order on an individual's ability to restore their firearm rights is "no minor consequence," even where that effect is "marginal." 402 Wis. 2d 379, ¶23. Vacating the September 2023 recommitment order would practically affect Ryden's ability to restore his firearm-possession rights because the order would no longer be part of the record the court considers when assessing Ryden's record and reputation for dangerousness and the public interest. We hold that this practical effect, even if marginal, is sufficient to render Ryden's appeal not moot.[9]

IV

¶20 We next address Ryden's merits argument: that the September 2023 recommitment order should be vacated because the circuit court relied on inadmissible hearsay when concluding that Ryden was dangerous, and the non-hearsay evidence was insufficient to support that conclusion.

¶21 As an initial matter, Ryden did not object to any portion of Weber's or Dr. Rainey's testimony at his recommitment hearing. Ryden thus forfeited any argument that testimony from either witness was improperly admitted or considered by the circuit court. *See* WIS. STAT. § 901.03(1)(a) (requiring a timely objection or motion to strike in the record before error may be predicated on a ruling admitting evidence); *State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612 (explaining that the purpose of requiring a timely objection is, in part, "to enable the circuit court to avoid or correct any error with minimal disruption of the judicial process"). Ryden did, however, object to the admission of alleged hearsay within Weber's and Dr. Rainey's reports, thus preserving that issue for appeal.

¶22 We need not decide whether admission of those reports was in fact erroneous. That is because even if it was, the error is harmless. An

---

[9] Ryden also argued that the stigma associated with involuntary mental commitment is a collateral consequence that renders appeals from expired recommitment orders not moot. We decline to address this argument because we hold that Ryden's appeal is not moot on other grounds.

error is harmless if it does not affect the substantial rights of either party. *Martindale*, 246 Wis. 2d 67, ¶30; *see also* WIS. STAT. § 51.20(10)(c) (requiring a court to disregard any error in a § 51.20 proceeding that does not affect a party's substantial rights). An error does not affect the substantial rights of either party when "the outcome [is] strongly supported by evidence" admitted at the hearing. *Martindale*, 246 Wis. 2d 67, ¶32. Here, we conclude that the admission of the reports did not affect Ryden's substantial rights because the unobjected-to testimony of Weber and Dr. Rainey alone strongly supports the circuit court's conclusion that Ryden was dangerous.

¶23 The circuit court concluded that Ryden was dangerous pursuant to § 51.20(1)(a)2.c. and (1)(am). Section 51.20(1)(a)2.c. states that an individual is dangerous if he "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself . . . or other individuals." Section 51.20(1)(am) applies in recommitment proceedings[10] and provides that the requirement of a "pattern of recent acts or omissions" in § 51.20(1)(a)2.c. "may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Putting those two standards together, an individual is dangerous if, based on the individual's treatment record: (1) there is a substantial likelihood that the individual would evidence impaired judgment if treatment were withdrawn; and (2) the likely impairment to judgment would create a substantial probability of physical impairment or injury to the individual or others.

¶24 Testimony from both Weber and Dr. Rainey supports the circuit court's conclusion that there is a substantial likelihood that Ryden would evidence impaired judgment if treatment were withdrawn. Weber testified that she was concerned, based on Ryden's history, that he would discontinue his medications and his symptoms would worsen if he was not recommitted. Dr. Rainey agreed, opining that if Ryden were to stop

---

[10] Section 51.20(1)(am) applies where, as here, "the individual has been the subject of outpatient treatment for mental illness . . . immediately prior to commencement of the proceedings as a result of a commitment ordered by a court under [§ 51.20]."

taking his prescribed medications, he would experience increased manic and grandiose beliefs and decreased mood stability. Dr. Rainey also testified that Ryden's mental illness "grossly impair[s] . . . his judgment" and "capacity to recognize reality." Finally, Weber gave examples of Ryden, when untreated, displaying delusional and paranoid beliefs. Those beliefs included "that his parents were going to be murdered" and that "there were intruders who were trying to enter his home that he had to protect himself and his family from."

¶25  The testimony from both witnesses also supports the conclusion that the likely impairment to Ryden's judgment would create a substantial probability of physical impairment or injury to Ryden or others. Dr. Rainey testified that Ryden "has a tendency when not on medications to become physically aggressive towards others." Weber also described instances of Ryden acting on paranoid and delusional beliefs in a threatening way. On one occasion, Ryden "conceal[ed] a knife in his sleeve" and "[became] aggressive towards his mother, push[ing] his mother into a corner causing her pain and causing her to feel unsafe." Weber described these actions as stemming from "the hallucinations and delusions that [Ryden] had that . . . there were intruders who were trying to enter his home." As another example, Weber explained that after Ryden "had made some homicidal ideations . . . towards family members," he had "broken into his parent[s'] bedroom in the middle of the night causing them to be fearful."

¶26  Because the unobjected-to testimony of Weber and Dr. Rainey strongly supports the circuit court's conclusion that Ryden was dangerous under § 51.20(1)(a)2.c. and (1)(am), the admission of the objected-to reports did not affect his substantial rights. We therefore conclude that any error in admitting the reports was harmless and must be disregarded. *See* § 51.20(10)(c).

V

¶27  We hold that Ryden's appeal of the now-expired September 2023 recommitment order is not moot because vacating the order would have a practical effect on two collateral consequences of that order: Ryden's liability for the cost of care received during that period of his commitment and his ability to restore his firearm rights. We further conclude that the September 2023 order should not be vacated. The circuit court's finding that Ryden was dangerous was strongly supported by the unobjected-to testimony admitted at Ryden's recommitment hearing. Any

error in the admission of reports purportedly containing hearsay was therefore harmless. We thus reverse the court of appeals' dismissal of Ryden's appeal but affirm the circuit court's recommitment order.

*By the Court.*—The decision of the court of appeals is reversed.

REBECCA FRANK DALLET, J., with whom JILL J. KAROFSKY, C.J., and JANET C. PROTASIEWICZ, J., join, concurring.

¶28     Hearsay is inherently unreliable. *See State v. O'Brien*, 2014 WI 54, ¶57, 354 Wis. 2d 753, 850 N.W.2d 8. Because hearsay is a statement made outside of court, *see* WIS. STAT. § 908.01(3), the declarant cannot be cross-examined and her statement thus cannot be subjected to the kind of adversarial testing we typically rely on to reveal the truth. For this reason, the default rule is that hearsay is inadmissible unless it falls within one of the exceptions or exemptions developed by the common law and codified in our rules of evidence. *See O'Brien*, 354 Wis. 2d 753, ¶57; WIS. STAT. ch. 908 (defining hearsay and the conditions under which it may be admissible). WISCONSIN STAT. ch. 51 incorporates these rules "[e]xcept as otherwise provided in th[at] chapter." WIS. STAT. § 51.20(10)(c).[1]

¶29     In this case, the County makes the novel argument that WIS. STAT. § 51.20(1)(am) "otherwise provide[s]" that hearsay is admissible at a recommitment hearing, so long as it is contained in the subject individual's treatment records. § 51.20(10)(c). In other words, the County argues that in recommitment hearings we should dispense with the carefully crafted hearsay rules and exceptions, and declare open season on any hearsay statements contained in the subject individual's treatment records. But if hearsay is too unreliable to be admitted in a garden variety breach-of-contract case, then the same should be true in an involuntary commitment case where "significant liberty interests [are] at stake." *Waukesha County v. E.J.W.*, 2021 WI 85, ¶30, 399 Wis. 2d 471, 966 N.W.2d 590. I write separately to explain why the County is wrong, and to underscore that the ordinary hearsay rules apply in recommitment hearings.[2]

---

[1] Under WIS. STAT. § 51.20(10)(c), "the rules of evidence in civil actions . . . apply" to proceedings under Chapter 51 "[e]xcept as otherwise provided in th[at] chapter." Those rules are found in WIS. STAT. chs. 901–11. *See* WIS. STAT. § 911.01(2).

[2] The majority opinion correctly declines to address the County's argument because it is not necessary to resolve this case. Even assuming that the circuit court erred in admitting two reports containing hearsay, that error was harmless. *See* majority op., ¶22.

¶30 To understand the County's argument, it is important first to explain what a county must show when it seeks a recommitment order. In order to recommit an already-committed individual, a county must prove that the individual is dangerous under one of the standards in § 51.20(1)(a)2.a.–e. or the standard in § 51.20(1)(am). *See* § 51.20(13)(g)3. Recent dangerous acts or omissions by the individual are required to establish dangerousness under § 51.20(1)(a)2.a.–e.[3] Because a committed individual is receiving treatment, however, there may not be evidence of such recent acts or omissions. Section 51.20(1)(am) thus provides "an alternative evidentiary path" for proving that a committed individual is dangerous that "reflect[s] [the] change in circumstances occasioned by [the] individual's commitment and treatment." *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509. Under that statute, a county may prove that a committed individual is dangerous by "showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment"—i.e., dangerous—"if treatment were withdrawn." § 51.20(1)(am).

¶31 According to the County, § 51.20(1)(am) does something more than just create an alternative path by which dangerousness may be proven at a recommitment hearing. The County argues that it also creates an exception to the ordinary rules of evidence. By permitting dangerousness to be proven "based on the subject individual's treatment record," the County maintains that § 51.20(1)(am) establishes the admissibility of all evidence contained in an individual's treatment records, including otherwise-inadmissible hearsay.

¶32 The text of § 51.20(1)(am), however, does not support this interpretation. Section 51.20(1)(am) contains no language expressly

---

[3] *See* § 51.20(1)(a)2.a. (requiring "evidence of recent threats of or attempts at suicide or serious bodily harm"), b. (requiring "evidence of recent homicidal or other violent behavior" or "a recent overt act, attempt or threat to do serious physical harm"), c. (requiring "evidence of a pattern of recent acts or omissions"), d. (requiring that the dangerous characteristic be "manifested by recent acts or omissions"), e. (requiring that the dangerous characteristic be "demonstrated by both the individual's treatment history and his or her recent acts or omissions").

establishing the categorical admissibility of treatment records or hearsay contained within them. Indeed, the words "admissible" and "hearsay," or any related word or phrase, do not appear in § 51.20(1)(am) at all.

¶33 By contrast, such express language is included in other statutes that permit the admissibility of otherwise-inadmissible evidence. WISCONSIN STAT. § 51.35(1)(e)4. (emphasis added), for example, expressly provides that "[h]earsay evidence *is admissible*" at a hearing to evaluate a proposed transfer of a committed individual between treatment facilities "if the hearing officer makes a determination that the evidence is reliable." WISCONSIN STAT. § 48.299(4)(b) (emphasis added) similarly directs that "[h]earsay evidence *may be admitted*" at certain hearings under WIS. STAT. ch. 48 "if it has demonstrable circumstantial guarantees of trustworthiness." And while the results of polygraph tests are generally inadmissible in civil proceedings,[4] WIS. STAT. § 51.375(2)(b) (emphasis added) states that a "committing court to which the results of a [lie detector] test have been disclosed *may admit the results in evidence* in a proceeding under ch. 980."[5] These statutes unequivocally create exceptions to the rules of evidence by identifying a type of typically inadmissible evidence (hearsay and the results of lie detector tests) and expressly stating that the evidence is admissible in certain identified proceedings. Section 51.20(1)(am) notably does neither.

¶34 Section 51.20(1)(am) differs from the hearsay exceptions in §§ 51.35(1)(e)4. and 48.299(4)(b) in another important way. Both exceptions limit admissibility to hearsay that is determined to be reliable, § 51.35(1)(e)4., or that "has demonstrable circumstantial guarantees of trustworthiness," § 48.299(4)(b). These limitations make sense, as we have held that "[r]eliability is the hallmark of admissible hearsay." *O'Brien*, 354 Wis. 2d 753, ¶57. Section 51.20(1)(am), however, contains no such limitation. If § 51.20(1)(am) were read to contain a hearsay exception, it would therefore be strikingly broad, allowing the admission of hearsay in treatment records regardless of reliability in proceedings at which an individual's liberty is at stake. *See Langlade County v. D.J.W.*, 2020 WI 41,

---

[4] *See Estate of Neumann ex rel. Rodli v. Neumann*, 2001 WI App 61, ¶¶59–62, 242 Wis. 2d 205, 626 N.W.2d 821.

[5] "Lie detector" in this context is defined by statute to include polygraph tests. *See* WIS. STAT. §§ 51.375(1)(b), 111.37(1)(b).

¶¶42–43, 391 Wis. 2d 231, 942 N.W.2d 277. There is no basis in the text, context, or legislative history[6] to read § 51.20(1)(am) as creating such an anomalous exception.

¶35 The County contends that § 51.20(1)(am) would be meaningless if hearsay contained in treatment records is generally excluded because it requires dangerousness to be proven "based on the subject individual's treatment record" and treatment records frequently contain hearsay. This is incorrect for two reasons. First, treatment records may be admitted when they are admissible under the ordinary rules of evidence. When a treatment record contains hearsay, that record may nevertheless be admissible if one of the ordinary hearsay exceptions applies.

¶36 Second, there are many ways to provide evidence that is "based on" a committed individual's treatment record, even if the actual records are not admitted. For example, testimony from the individual's treatment providers[7] or case workers about the individual's diagnoses, treatment, or likely response to the withdrawal of treatment is evidence "based on" the individual's treatment record. Furthermore, recommitment hearings regularly involve expert testimony from physicians appointed by the court to examine the committed individual. These experts may review the individual's treatment records, including hearsay contained within them, when forming their opinions.[8] When these experts testify about

---

[6] While "carefully weighed, relevant legislative history can be an indicator of a statute's meaning," no relevant legislative history was found here. *Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶43, 398 Wis. 2d 386, 961 N.W.2d 346 (Dallet, J., concurring).

[7] While a patient typically "has a privilege . . . to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of" the patient's diagnosis or treatment among the patient and certain health-care providers, WIS. STAT. § 905.04(2), this privilege does not apply in commitment proceedings under § 51.20. *See* § 905.04(4)(a).

[8] *See* WIS. STAT. § 907.03 (providing that the facts or data on which an expert bases an opinion "need not be admissible in evidence"); *Karl v. Emps. Ins. of Wausau*, 78 Wis. 2d 284, 299, 254 N.W.2d 255 (1977) ("[I]t [is] proper for a physician to make a diagnosis based in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others.").

their opinions, they are also providing evidence that is "based on" the individual's treatment record.[9]

¶37     Finally, the County claims that excluding hearsay contained in treatment records leads to the absurd result "of calling fact witnesses to testify to dangerous events year after year after year." But there is nothing absurd about following the same evidentiary rules at recommitment hearings that apply in nearly all other civil proceedings, even if that means some witnesses may be asked to testify more than once.

¶38     In sum, § 51.20(1)(am) establishes an alternative method for proving dangerousness at recommitment hearings, not a rule about the admissibility of evidence. *See J.W.K.*, 386 Wis. 2d 672, ¶19. It describes what must be proven (that the subject individual is substantially likely to become dangerous if treatment were withdrawn) and how that must be proven (based on the individual's treatment record). *See* § 51.20(1)(am). None of this, however, establishes or implies the categorical admissibility of treatment records or hearsay contained within those records. Because the legislature has not provided otherwise, the ordinary rules of evidence apply to recommitment proceedings under § 51.20. *See* § 51.20(10)(c). Hearsay is inadmissible under those rules unless it falls within one of chapter 908's exceptions. Accordingly, I respectfully concur.

---

[9] Importantly, however, while "WIS. STAT. § 907.03 allows an expert to base an opinion on hearsay, it does not transform the hearsay into admissible evidence." *Walworth County v. Therese B.*, 2003 WI App 223, ¶8, 267 Wis. 2d 310, 671 N.W.2d 377; *see also* § 907.03 (providing that when an expert relies on otherwise-inadmissible facts or data when forming an opinion, that evidence "may not be disclosed to the [factfinder] by [the expert] unless the court determines that their probative value in assisting the [factfinder] to evaluate the expert's opinion . . . substantially outweighs their prejudicial effect"). The proponent of an expert thus may not "use the expert solely as a conduit for the hearsay opinions of others." *Therese B.*, 267 Wis. 2d 310, ¶9. If an expert physician appears to be testifying about the hearsay opinions of others, the subject individual may therefore object to the admission of that testimony.

ANNETTE KINGSLAND ZIEGLER, J., with whom REBECCA GRASSL BRADLEY, J., joins, dissenting.

¶39     Appeals from recommitment orders require the ward to demonstrate that a favorable decision would have some impact on him. This appeal is missing any such demonstration. We should require that showing before reaching the merits of this case. Not every such case is moot, but some are—and this is an example. Even if we were to grant the requested relief, Ryden's situation remains unchanged as he faces no collateral consequences of the recommitment order. I respectfully dissent and write separately to clarify that recommitment orders can be moot.

¶40     Issues are moot when their "resolution will have no practical effect on the underlying controversy." *Portage Cnty. v. J.W.K.*, 2019 WI 54, ¶11, 386 Wis. 2d 672, 927 N.W.2d 509 (citation omitted). When persistent collateral consequences exist, and reversal would practically affect them, commitment orders are not moot. *Marathon Cnty. v. D.K.*, 2020 WI 8, ¶25, 390 Wis. 2d 50, 937 N.W.2d 901. Collateral consequences require a causal connection between the consequence and the challenged order to overcome the expired commitment's mootness. *See J.W.K.*, 386 Wis. 2d 672, ¶28 n.11 ("Our holding that [commitment challenges are] moot is limited to situations where, as here, no collateral implications of the commitment order are raised.").

¶41     This court held that a commitment's expiration does not categorically render a committee's appeal moot in *Marathon County v. D.K.*, 390 Wis. 2d 50. In that case, the circuit court "ordered D.K.'s involuntary commitment for six months." *Id.*, ¶2. The commitment order subjected the committee to a firearms ban. *Id.*, ¶12. Although the commitment order had expired, the court held that the lasting impact of the committee's firearms ban was an ongoing collateral consequence of his prior commitment. *Id.*, ¶25. When a "causal relationship" persists between the order being appealed and a collateral consequence that would be practically affected by the appeal, a committee's appeal of the expired order is not moot. *Id.*, ¶24 (citation omitted); *see also State v. Theoharopoulos*, 72 Wis. 2d 327, 240 N.W.2d 635 (1976) (reaching the merits of a prior conviction because there was a "causal relationship" because the previous conviction could result in the further penalty of deportation).

¶42     The court radically weakened this reasoning when addressing an expired recommitment order in *Sauk County v. S.A.M.*, 2022 WI 46, 402 Wis. 2d 379, 975 N.W.2d 162. In *S.A.M.*, a man was committed

under WIS. STAT. § 51.20. *Id.* The initial six-month commitment order included a firearms ban that remained effective until a court lifted the prohibition. *Id.* The man was recommitted for another six months which, once again, included a firearms proscription. *Id.*, ¶13. He appealed his recommitment, but a series of events prevented his appeal from being filed until the recommitment order had expired. *Id.*, ¶15. In holding that S.A.M.'s recommitment appeal was not moot, the court identified two collateral consequences that were causally connected to the recommitment order. The first collateral causal connection was the ability for a reviewing court to review the committee's petition to restore his Second Amendment rights under § 51.20(13)(cv)1m.b. *Id.*, ¶23. Though the recommitment had terminated, the court decided that "if a committed person succeeds in vacating an expired recommitment order, the fact that the recommitment order no longer exists might influence the reviewing court's weighing of whether restoring gun rights would be consistent with the public interest." *Id.* (internal citation and quotations omitted). The second collateral causal connection was the committee's financial liability for costs of care. *See id.*, ¶25.

¶43    *S.A.M.* is unsound in principle, demonstrating a profound misunderstanding of mootness. The *S.A.M.* court correctly noted that an appeal is not moot "when the direct or collateral consequences of the order persist and vacatur of that order would practically affect those consequences." *Id.*, ¶19. The court, however, held that the case was not moot based on purely theoretical consequences. *Id.*, ¶39 (Ziegler, C.J., concurring in part, dissenting in part). The court's decree rendered countless otherwise moot cases no longer moot. This case perfectly illustrates the *S.A.M.* court's error.

¶44    To start, overturning Ryden's expired recommitment order after he has been subsequently recommitted would not practically impact Ryden's constitutional rights. Regardless of the outcome of this appeal, Ryden's three other commitments impose the exact same consequences. Ryden was originally committed in 2021. Then, he was recommitted in 2022, 2023, and 2024. But Ryden is appealing only his 2023 recommitment. Even if Ryden was successful in this appeal, he still faces a firearms ban from each of the other commitment and recommitment orders. And, that fact would not be impacted by this appeal. Had he appealed his most recent commitment, that would at least inform a petitioned court that his previous struggles subsided long ago. But no court would seriously consider restoring a committed and dangerous individual's firearms rights simply because one of his multiple recommitments may have been

procedurally deficient (and, even here, it was not). There is simply no practical effect that a successful appeal would have made on Ryden's firearms ban here.

¶45 And stigmas are not collateral consequences. Collateral consequences require a causal connection with the challenged order. *J.W.K.*, 386 Wis. 2d 672, ¶28 n.11. Stigmas lack that causal connection, generally. Unless the committee is appealing an original commitment, the stigma associated with being involuntarily committed persists eternally. Notably, both committees in *D.K.* and *S.A.M.* argued that the stigma accompanying a commitment order rendered their cases not moot. But the court's holdings did not recognize stigmas as collateral consequences. *See D.K.*, 390 Wis. 2d 50, ¶25 n.7 (declining to decide the issue of stigma after finding other grounds for non-mootness); *S.A.M.*, 402 Wis. 2d 379, ¶27 n.5 (same). And here, the record does not indicate that society will stigmatize Ryden less for his mental health history if this recommitment order were reversed on appeal. Ryden is not arguing that he should never have been originally committed. Thus, whatever perceived social stigma that Ryden thinks may stem from involuntary commitments will follow him regardless of whether we overturn this particular recommitment order. And, given the three other orders, it is hard to imagine how removing one recommitment would absolve that stigma. This is especially true considering that Ryden has been recommitted since pursuing this appeal, and he is not appealing that most recent recommitment order.

¶46 Furthermore, declaring that stigmas keep commitment controversies alive would create the bright-line rule that all commitment and recommitment orders are never moot. That is not how our jurisprudence works. The perception that a committee may be socially stigmatized from being involuntarily committed does not categorically render a committee's appeal not moot.

¶47 "Liability for the cost of" caring for Ryden can be a collateral consequence. *S.A.M.*, 402 Wis. 2d 379, ¶24; *id.*, ¶¶48–50 (Ziegler, C.J., concurring in part, dissenting in part). But there is no guarantee that it is one. As several justices of this court predicted years ago, allowing the potential financial liabilities to constitute collateral consequences is unworkable in practice. The potential liability for committees is too speculative to render every appeal ripe for adjudication. Keeping every case alive simply for theoretical cost-of-care liabilities has kept the appellate system flooded with moot cases. Other litigants have tried to extend *S.A.M.* outside the WIS. STAT. ch. 51 context too. *E.g.*, *State v.*

*Wilhite*, 2025 WI App 64, ¶1 n.1, 418 Wis. 2d 471, 27 N.W.3d 238. That is untenable.

¶48 Particularly here, where the County is not seeking reimbursement for Ryden's care. While the County "may bring an action to enforce the liability," WIS. STAT. § 46.10(4)(a), it is not obligated to do so, and here, it has said that it is not. And before it even tried to collect from Ryden, the County would have to decide to pursue Ryden, an individual the County has been guarding for years, prove the costs of the "care, maintenance, services and supplies" provided to Ryden under § 46.10(2), "investigat[e]" and consider Ryden's "ability to pay," § 46.10(3), and then overcome any of Ryden's defenses to payment, § 46.10(11)(a). Here, the County has expressed that it is not going to pursue reimbursement from Ryden.

¶49 To date, there is no indication that Ryden owes the County any money. Nothing in the record shows that he has any outstanding debt accruing or that the County has attempted to collect against him. To the contrary, the County averred during oral argument that Ryden's debt has been satisfied. Instead, Ryden is asking us to speculate that at some point he may be liable for the cost of care. "A theoretical and unproven collateral consequence has never been a standalone reason to conclude that a case is not moot." *S.A.M.*, 402 Wis. 2d 379, ¶40 (Ziegler, C.J., concurring in part, dissenting in part). That precludes claims for hypothetical liabilities and should be dispositive where the County has already informed the courts that it does not intend to seek remuneration.

¶50 Potential liability under WIS. STAT. § 46.10(2) does not automatically cause an appeal to be not moot. Those liabilities turn into an enforceable debt if the County exercises that discretion. There is simply nothing on this record to indicate that Ryden would be financially liable for the cost of care associated with this case. Therefore, the speculative liability imposed by § 46.10(2) alone should not be the type of collateral consequence that prevents mootness.

¶51 In short, the appeal of a recommitment order is sometimes moot. Ryden's appeal is moot here as it would have no impact on the prohibitions that accompany it. For the foregoing reasons, I respectfully dissent.